IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 17, 2025

## STATE OF TENNESSEE v. FREDRICK DEVELL RICE, JR.

**Appeal from the Circuit Court for Rutherford County**
**No. 87944, 87945    Barry R. Tidwell, Judge**

————————————————————

**No. M2024-01219-CCA-R3-CD**

————————————————————

The Defendant, Fredrick Devell Rice Jr., entered guilty pleas to being a convicted felon in possession of a firearm, tampering with evidence, and felony drug possession with intent to sell. The trial court imposed an effective sentence of ten years and placed the Defendant on probation after service of twelve months incarceration. The Defendant subsequently tested positive for fentanyl and norfentanyl four times. At the Defendant's probation violation hearing, the Defendant objected to an assessment report the State offered through a witness who did not prepare it as inadmissible hearsay, which was overruled by the trial court. The trial court revoked the Defendant's probation and ordered him to serve the remainder of his sentence. In this appeal, the sole issue presented for our review is whether the trial court erred in admitting the testimony from the assessment report. After review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which TOM GREENHOLTZ, J., joined. ROBERT H. MONTGOMERY, JR., J. concurring in results only.

Brennan M. Foy, Assistant Public Defender; Gerald Melton, District Public Defender, for the appellant, Fredrick Devell Rice, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Jennings H. Jones, District Attorney General; and Brent Pierce, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This appeal stems from the Defendant's drug use while on probation after pleading guilty to three offenses related to two separate incidents. The first incident occurred on

September 30, 2021, when a police officer observed the Defendant lying unconscious on a street in Murfreesboro. The officer found a handgun, six grams of marijuana, and seventy (70) Alprazolam tablets on the Defendant's person, and determined that the Defendant was a danger to himself and others. The second incident occurred on January 14, 2022, when a vehicle in which the Defendant was a passenger drove over a curb and crashed into a ditch. A police officer observed the Defendant throw an open beer bottle out of the window and found another open alcohol container, two grams of marijuana, and two marijuana grinders inside the vehicle. After the officer arrested and booked the Defendant into jail, law enforcement found twenty-one (21) Xanax pills on the Defendant's person. The Defendant had a prior criminal record that included a felony armed robbery conviction.

After the first incident, the Defendant was charged with public intoxication, a Class C Misdemeanor, in violation of Section 39-17-310 of the Tennessee Code Annotated (Count One); possession of a firearm while intoxicated, a Class A Misdemeanor, in violation of Section 39-17-1321 (Count Two); being a convicted felon in possession of a firearm, a Class B Felony, in violation of Section 39-17-1307(b)(1) (Count Three); possession of a firearm during the commission of a dangerous felony, a Class D Felony, in violation of Section 39-17-1324(a) (Count Four); possession of a schedule IV substance with intent to manufacture, sell, or deliver, a Class D Felony, in violation of Section 39-17-417(e) (Count Five); and simple marijuana possession, a Class A Misdemeanor, in violation of Section 39-17-418 (Count Six). The Defendant pleaded guilty to Counts Three and Five. The remaining charges were dismissed.

After the second incident, the Defendant was charged with public intoxication, a Class C Misdemeanor, in violation of Section 39-17-310 of the Tennessee Code Annotated (Count One); tampering with evidence, a Class C Felony, in violation of Section 39-16-503 (Count Two); simple marijuana possession, a Class A Misdemeanor, in violation of Section 39-17-418 (Count Three); simple possession of a Schedule IV substance, a Class A Misdemeanor, in violation of Section 39-17-418 (Count Four); and unlawful possession of drug paraphernalia, a Class A Misdemeanor, in violation of Section 39-17-425 (Count Five). The Defendant pleaded guilty to the lesser included offense of attempted tampering with evidence, a Class D Felony, in Count Two. The remaining charges were dismissed.

The Defendant entered guilty pleas to both sets of charges on August 8, 2022. In his negotiated plea agreement, the Defendant agreed to serve an eight-year sentence on Count Three concurrently with a two-year sentence on Count Five. The Defendant also agreed to serve his concurrent sentences on Counts Three and Five consecutively with a two-year sentence on Count Two, for an effective sentence of ten years. The Defendant agreed to be sentenced as a Range I standard offender on each count. The Defendant also agreed to have his sentence suspended to nine years of probation after serving one year of shock incarceration. The Defendant agreed to "not use intoxicants (beer, whiskey, wine,

etc.) to any kind of excess, or use or have in [his] possession illegal drugs" while on probation. The Defendant also agreed to "submit to random drug screenings as directed." The trial court entered its final judgment on August 9, 2022.

The Rutherford County Circuit Court issued a violation of probation warrant for the Defendant on October 25, 2023, after he tested positive for cocaine, fentanyl, norfentanyl, and marijuana. The Defendant tested positive for fentanyl and norfentanyl on March 4th, April 10th, and May 1st of 2024, and the Rutherford County Circuit Court issued amended violation of probation warrants after each failed test.

On April 17, 2024, Javaun Verge of the Murfreesboro Day Reporting Center ("DRC") conducted an intake assessment to determine the Defendant's eligibility for the DRC program. Although the intake assessment was not offered as an exhibit to the probation revocation hearing, as relevant to the issue raised in this appeal, the assessment provided that "the Defendant [did] not intend on stopping his drug use because he [did] not want to." The report also stated that the Defendant "discussed that he wants to live his life the way he wants to." The report concluded with a recommendation for the Defendant to "be ordered to participate in mental health court and submit to a drug and alcohol assessment."

At the Defendant's probation violation hearing, held on August 8, 2024, Christopher Jones, a probation officer with the Tennessee Department of Corrections ("TDOC") testified that he supervised the Defendant during his probation. Jones testified that the Defendant's probation began in February 2023, and that the Defendant complied with the terms of his probation until September 24, 2023, when he tested positive for cocaine, fentanyl, norfentanyl, and marijuana. Jones also testified that the Defendant was arrested on November 4, 2023, based on his first violation of probation warrant, and was released on his own recognizance. Jones testified that the Defendant was referred to the TDOC's behavioral health specialist for an alcohol and drug assessment after testing positive for fentanyl and norfentanyl three times between March and May of 2024. Jones also testified that the behavioral health specialist wanted to send the Defendant to a residential drug treatment facility but the Defendant "refused to go." Jones explained that he was not present during the assessment and, therefore, could not testify as to the reasons the Defendant refused treatment.

Jones testified that he interreacted with the Defendant at least three times per month before he violated his probation and once a month thereafter. Jones also testified that "you could tell [the Defendant] was under the influence" during some of these interactions based on his "fidgeting," "certain movements," "nodding off," and "falling to sleep." Jones testified that the Defendant was not a good candidate for continued TDOC supervision due to his continued fentanyl use and his refusal to accept help. In response to examination by

the trial court, Jones testified that he stopped supervising the Defendant in May 2024 after transferring to a new position in TDOC. Jones also testified that the Defendant was offered treatment on May 1, 2024, and would have received inpatient residential treatment if he accepted the offer.

On cross-examination, Jones testified that TDOC recently implemented a procedure for expediting treatment for people who test positive for fentanyl, and that one failed drug test does not necessarily mean a person needs treatment. Jones explained that "there's not much [TDOC] can do" if someone refuses treatment. Jones confirmed the Defendant failed four drug tests before TDOC offered him treatment, which he declined. Jones also confirmed that he did not know why the Defendant refused the offer because he was not in the room at the time. Jones testified the Defendant had an ongoing court case when the offer was made.

Jones confirmed that he began supervising the Defendant in February 2023. Jones testified that he initially met with the Defendant three times per month, but, after the Defendant violated his probation, they only met once a month because the Defendant went into "warrant status." Jones testified that he stopped supervising the Defendant in May or June of 2024, and that the Defendant did not miss any of their meetings. Jones testified that, while the Defendant was under his supervision, he verified the Defendant's housing and employment with McDonald's. Jones also testified that, other than his failed drug tests, the Defendant abided by the terms of his probation.

DRC Program Director Richard Boyd testified that DRC staff reviews each intake assessment with him and that final admission decisions are his responsibility. Boyd testified that he did not perform the Defendant's intake assessment. When the State asked Boyd how the Defendant's assessment went, defense counsel objected "to hearsay about the assessment." The State argued that Boyd would testify about his decision-making process and that his ultimate answer would be that he denied the Defendant admission to the DRC program. The trial court overruled the objection, finding that Boyd could "testify as to why he made that decision," and that the truth was that the Defendant was denied admission to the program.

Immediately after the trial court denied the objection, Boyd testified as follows:

I'll quote from the [Assessment and Eligibility Report] that . . . has been filed with the court. For the motivators, it says, "[The Defendant] discussed that he wants . . . to live his life the way he wants to."

And, so, he did not want to stop using drugs. Nothing we can do about that.

Boyd explained the DRC program was designed for people who want to become sober.

- 4 -

On cross-examination, Boyd testified that Verge performed the Defendant's intake assessment and wrote that the Defendant "wanted to live his life the way he wanted" in the Assessment and Eligibility Report. Boyd also testified that he did not personally hear the Defendant make any statements about wanting to continue his drug use.

The Defendant testified that he began using drugs when he was eight years old, when he first consumed marijuana, and that he had since consumed methamphetamine, fentanyl, psilocybin mushrooms, and LSD. The Defendant also testified that fentanyl and marijuana were his current drugs of choice, and that he first consumed fentanyl while in prison in 2018. The Defendant explained that he began using fentanyl to deal with the stress of "[s]eeing [the] things that [he] was seeing" while incarcerated. The Defendant testified that he first went to prison in 2008, at the age of 18, after he was sentenced to two years for aggravated robbery and burglary. The Defendant testified that he had spent a total of ten years in prison over the course of his life, including 12 months for this case.

The Defendant confirmed that he tested positive for fentanyl four times between September 2023 and May 2024 and testified that he had never gone to a rehabilitation center or participated in any outpatient drug treatment program prior to the hearing. The Defendant also testified that he refused TDOC's offer to participate in an inpatient drug treatment program because he had a pending court case. The Defendant testified that he intended to ask the court if he could seek treatment at a hearing. The Defendant testified that he tried to enroll in a drug treatment program at Buffalo Valley with the assistance of the STOP program, but they did not have any beds available. The Defendant also testified that he was unsure why his enrollment had been delayed. The Defendant testified that he could not afford treatment at Buffalo Valley on his own, so he would need to receive a court ordered grant through the STOP program.

The Defendant testified that he wanted to seek treatment for his drug use due to his mental health struggles. The Defendant also testified that he had not received a mental health evaluation since going to prison. The Defendant testified that, "When I get to stressing or if I feel like I can't make it in life, I go to what I know best, and it's getting high." The Defendant also testified that he understood that Buffalo Valley would help him with the mental health aspect of his drug use. The Defendant explained Boyd's testimony about his desire to "live life how he wants to" as follows: "[S]ometimes I just feel like lower people will tell me how to cope with my problems or to feel how I'm supposed to feel or do what I'm supposed to do to get [over] whatever is going on in my mind[.]" The Defendant testified that he tries to "take life as it comes," but "if [he] can't," he accepts "whatever happens."

On cross-examination, the Defendant testified that he did not know that he would not have to pay for the treatment program TDOC recommended. The Defendant also

testified that he did not know how the program would impact his obligations to appear in court or if the court would approve the program. The Defendant testified that he would enroll in the program if the trial court "sign[ed] off on it." The Defendant testified that he did not tell the DRC that he wanted to continue his drug use. The Defendant testified that he told the DRC that he did not enjoy being told "what to do" or "how to live [his] life" because he does not "know how to cope with anything." The Defendant explained, "It's just like if I'm in prison and they tell me to lock down. I don't like to lockdown, but I'll lockdown." The Defendant testified that he had pled guilty to a variety of charges in Rutherford County, including drug possession charges, theft, aggravated burglary, and aggravated robbery, between 2008 and 2022. The Defendant also testified that he was charged with aggravated assault in Johnson County after "fighting with a police officer" while incarcerated. However, the Defendant insisted that he had acted in self-defense after the officer punched him.

On redirect examination, the Defendant testified that he understood there would be times in his life where he would have to follow other people's instructions, even if he did not like it. By way of providing an example, the Defendant testified that he did not like reporting to his probation officer, but he still did so. The Defendant also testified that Buffalo Valley did not have a bed for him because the funding for his treatment had not been approved and processed.

The trial court called Amanda Morrow as a witness to determine if the Defendant was eligible for Community Corrections given his criminal record. Morrow testified that anyone who is eligible for probation is eligible for Community Corrections, even if they have been convicted of violent offenses. In response to questioning from the State, Morrow testified that she would need to consult the rules to determine the Defendant's eligibility for the program. In response to questions from defense counsel, Morrow testified that she did not think an assessment was needed to determine if the Defendant was eligible. Morrow also testified that the Defendant would need to familiarize himself with the house arrest rules before enrolling in the program. Morrow testified that she was unaware of anyone enrolled in Community Corrections who had a past rape conviction, but there were individuals in the program with aggravated assault and felon in possession of a firearm convictions. Morrow also testified that there have been past enrollees who had been convicted of second-degree murder. In response to further questioning from the trial court, Morrow testified that several people in the program had been convicted of being a felon in possession of a weapon.

The trial court found that the Defendant needed treatment, but that "he turned down treatment with state probation." The trial court did not find the Defendant's stated reason for refusing treatment—that he needed to get the judge's approval first—credible. Regarding the DRC's Assessment and Eligibility Report, the trial court found:

[The Defendant was] interviewed by [DRC]. And the reports are part of the record in the file. It's not made -- been made an exhibit. But certainly the testimony from [Boyd] was that [the Defendant] discussed during the assessment he does not intend on stopping drug use because he does not want to.

[The Defendant] also stated that no one has contributed to his substance use and that he has not participated in treatment before.

Based on the violation of probation warrant and the three amended warrants showing the Defendant failed four drug tests, the trial court found that the Defendant had violated a condition of his probation by a preponderance of the evidence. The trial court found that returning the Defendant to probation was not appropriate based on Jones's testimony and the Defendant's refusal to accept treatment. The trial court gave the Defendant credit for reporting to his probation officer and found that there was "some value to the community . . . for seeing that [the Defendant] has some rehabilitation," despite his "very lengthy record[.]" The trial court found the Defendant does not like being told what to do but will comply with instructions begrudgingly.

The trial court was not convinced that the Defendant wanted to participate in treatment and credited the DRC's Assessment and Eligibility Report because there was nothing to rebut it. The trial court found the Defendant's statement to the DRC that he did not want to stop using drugs and that he did not like being told what to do credible based on his violation warrants and failed drug tests. The trial court found that the Defendant was not a good candidate for probation, Community Corrections, or the DRC. Based on these findings, the trial court found that there was no "alternative that . . . would suit [the Defendant] other than" revoking his probation. The trial court ordered "that [the Defendant's] sentence be put into effect," with credit for time served.

The trial court entered a written order revoking the Defendant's probation the same day as the hearing. The Defendant timely filed a notice of appeal less than a week later, and this case is properly before this court.

## ANALYSIS

The Defendant argues the trial court erred in allowing the introduction of inadmissible hearsay evidence—specifically, Boyd's testimony quoting the DRC's Assessment and Eligibility Report—and abused its discretion in relying on that hearsay evidence when it decided to reinstate his original sentence. The Defendant asks for the trial court's decision to be reversed and remanded for reconsideration without the hearsay evidence. The State argues the trial court did not abuse its discretion, the Assessment and

Eligibility Report was admissible, and any error caused by its admission was harmless. The State also argues the Defendant waived the hearsay issue because his objection to the hearsay evidence was not timely. The Defendant contends in his reply brief that his objection to the hearsay evidence was timely. We agree with the Defendant on the timeliness of his objection. We also conclude that the trial court erred in admitting the testimony from the assessment.

Trial courts "possess the power, at any time within the maximum time that was directed and ordered by the court for the suspension [of the defendant's sentence], in accordance with § 40-35-311, to revoke the suspension." Tenn. Code Ann. § 40-35-310(a). Section 40-35-311 provides the procedures trial courts must follow during probation revocation proceedings.

"[A] trial court may revoke a sentence of probation upon finding by a preponderance of the evidence that the defendant has violated the conditions of his release." State v. Beard, 189 S.W.3d 730, 734-35 (Tenn. Crim. App. 2005); see State v. Dagnan, 641 S.W.3d 751, 756 (Tenn. 2022). The statutes in effect at the time of the Defendant's revocation hearing authorize a trial court, after finding a defendant had violated probation, to impose one of the following consequences: (1) order incarceration for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period by up to one year for each violation of Code section 40-35-308(c)(1); or (4) return the defendant to probation on appropriate modified conditions. Tenn. Code Ann. §§ 40-35-308, -310, -311; see Dagnan, 641 S.W.3d at 756 (citing Beard, 189 S.W.3d at 735 and n.2). If the trial court revokes a defendant's probation and suspension of sentence, then the defendant has the right to appeal. Tenn. Code Ann. § 40-35-311(e)(3); Tenn. R. App. P. 3(b).

Probation revocation involves the following two-step consideration: "[a] trial court, upon finding by a preponderance of the evidence that a defendant violated the conditions of his or her probation, must determine (1) whether to revoke probation, and (2) the appropriate consequence to impose upon revocation." Dagnan, 641 S.W.3d at 753. While a trial court is required to conduct a probation revocation hearing pursuant to Code section 40-35-311(b), this two-step consideration does not obligate the trial court "to hold an additional or separate hearing to determine the appropriate consequence." Id. at 757. These two steps are "two distinct discretionary decisions, both of which must be reviewed and addressed on appeal." Id. at 757-58. "Simply recognizing that sufficient evidence existed to find that a violation occurred does not satisfy this burden." Id. at 758.

In considering the appropriate consequence to impose upon revocation, a trial court may consider, but is not limited to, the following: the number of revocations, the seriousness of the violation, the defendant's criminal history, and the defendant's character.

Dagnan, 641 S.W.3d at 759 n.5. Consideration of past criminal history is only appropriate in the second part of the two-step analysis. Id.

This court reviews a trial court's revocation of probation for an "abuse of discretion with a presumption of reasonableness so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." Id. at 759. "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010). "It is not necessary for the trial court's findings to be particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." Dagnan, 641 S.W.3d at 759 (citing State v. Bise, 380 S.W.3d 682, 705-06 (Tenn. 2022)). Sufficient findings serve "'to promote meaningful appellate review and public confidence in the integrity and fairness of our judiciary.'" Id. (quoting State v. King, 432 S.W.3d 316, 322 (Tenn. 2014)). However, when the trial court "failed to place its reasoning for a revocation decision on the record, the appellate court may conduct a de novo review if the record is sufficiently developed for the court to do so, or the appellate court may remand the case to the trial court to make such findings." Id. (citing King, 432 S.W.3d at 327-28).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Although hearsay is generally not admissible at trial, Tenn. R. Evid. 802, the Tennessee Supreme Court has noted that "the full panoply of rights due a defendant in criminal prosecutions" do not apply to probation revocations. State v. Wade, 863 S.W.2d 406, 408 (Tenn. 1993) (internal quotation marks omitted). Specifically, "[t]he strict rules of evidence do not apply in a probation revocation hearing." State v. Stinnett, No. E2012-02289-CCA-R3-CD, 2013 WL 3148724 at *3 (Tenn. Crim. App. 2013) (citing Barker v. State, 483 S.W.2d 586, 589 (Tenn. Crim. App. 1972)). Similarly, a defendant's right to confront witnesses against him, found in both the United States Constitution and the Tennessee Constitution, does not extend to probation revocation hearings. State v. Walker, 307 S.W.3d 260, 265 (Tenn. 2009) (citing Morrissey v. Brewer, 408 U.S. 471, 481-89 (1972)). In probation revocation hearings, only the minimum requirements of due process must be met. Wade, 863 S.W.2d at 408 (citing Gagnon v. Scarpelli, 411 U.S. 778, 786 (1973)). These requirements include a "conditional right to confront and cross-examine adverse witnesses." Id. Under this conditional right, the admission of hearsay evidence does not violate the defendant's constitutional rights if the trial court finds that: (1) there is "good cause" to deny the right to confront and cross-examine an adverse witness; and (2) the evidence is reliable. Id. at 409.

- 9 -

Finally, Rule 36(a) states that appellate relief is typically not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a); see also Tenn. R. Evid. 103(a) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence); State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000) (holding that a failure to object to otherwise inadmissible evidence renders the evidence admissible). Here, the State argues that the Defendant's objection to the hearsay evidence was not timely because he objected prematurely and failed to renew his objection when the hearsay was actually elicited. The record shows that the Defendant objected to "hearsay about the assessment," when the State asked Boyd about the DRC's intake assessment. After the trial court overruled the objection, Boyd directly quoted from the DRC's Assessment and Eligibility Report. We conclude that the Defendant's objection to the hearsay evidence in this case was timely.

Though the trial court found that the "statement from the [DRC]" and Boyd's testimony was reliable, it made no specific finding that there was good cause to justify denying the Defendant's right to confront and cross-examine Verge, the DRC staff member who prepared the Assessment and Eligibility Report. The trial court not only failed to make a specific good cause finding, but it also failed to acknowledge the good cause requirement. In any case, the record is silent as to why Verge was not presented as a witness and, therefore, does not support a finding of good cause. Accordingly, we conclude that the admission of testimony quoting the Assessment and Eligibility Report was in error and violated the Defendant's due process rights. See State v. Littrell, No. W2022-01433-CCA-R3-CD, 2023 WL 6548679, at *3 (Tenn. Crim. App. Oct. 9, 2023) (concluding that the admission of hearsay evidence violated the defendant's due process rights because the trial court failed to make a specific good cause finding); Wade, 863 S.W.2d at 409 (holding that good cause was not shown when the record provided no explanation as to why the declarant was not presented).

The Defendant does not dispute that the trial court would have found that he violated the terms of his probation "with or without the hearsay evidence." He nevertheless contends that the admission of the hearsay evidence was not harmless because the trial court substantially relied on the evidence in its decision to reinstate the Defendant's original sentence. Thus, the Defendant argues there is substantial proof that the hearsay testimony "more probably than not affected the judgment" and urges this court to reverse and remand for a new hearing.

A non-structural constitutional error does not require reversal if the State demonstrates "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967); see also State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002). The Defendant does not dispute the trial court's

decision to revoke his probation. His challenge rests primarily with the trial court's determination of the appropriate sentence. Here, there is ample evidence in the record apart from the hearsay referenced in the assessment report to support the trial court's decision to reinstate the Defendant's original sentence. Jones testified that the Defendant refused TDOC's offer to enroll in a drug treatment program, which was separate from the DRC's offer. The trial court found the Defendant's explanation for refusing TDOC treatment not credible. Jones testified that the Defendant was not a good candidate for continued TDOC supervision based on his refusal of treatment and continued drug use. The Defendant was also not accepted for treatment at the DRC. The Defendant denied that he wanted to continue to use drugs and explained that he did not like people telling him how to live his life. When asked what he thought was happening in court during the revocation hearing, the Defendant said, "The same thing. People telling me how to live my life." Asked if he did not like when that happened, the Defendant explained, "It's not that I don't like it. I just - - if I feel a certain way, I'm like cool with it. But I'm cool with it like it is what it is." The Defendant also testified that he would comply with instructions from others, but only begrudgingly, stating, "It's just like if I'm in prison and they tell me to lock down. I don't like lockdown, but I'll lockdown." The Defendant also agreed he had a criminal history including theft, tampering and attempt to tamper with evidence, two convictions for possession of a firearm with a deadly weapon, three felony drug related convictions, aggravated burglary, facilitation of aggravated burglary, and aggravated assault involving a police officer while in jail. Based on this evidence, it is reasonable to conclude (1) that the Defendant would not comply with orders from the court to ensure effective rehabilitation and (2) that the Defendant is not amenable to continued probation. Accordingly, the outcome of the probation violation hearing would not have been different had the report been excluded, and the Defendant is not entitled to relief.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgments of the trial court are affirmed.


s/                    Camille                R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 11 -